## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRANDON M. WILBORN,                    :
                                       :
            Plaintiff,                 :
                                       :
      v.                               :          Civil Action No. 18-3597
                                       :
JEFFERSON B. SESSIONS III,             :
Attorney General of the United States, :
                                       :
THOMAS E. BRANDON,                     :
Acting Director, Bureau of Alcohol,    :
Tobacco, Firearms and Explosives,      :
                                       :
CHRISTOPHER WRAY,                      :
Director of the Federal Bureau         :
of Investigation,                      :
                                       :
      and                              :
                                       :
UNITED STATES OF AMERICA,              :
                                       :
            Defendants.                :

## ORDER

AND NOW, this _____ day of _____ 2018, upon consideration

of plaintiff's motion for a preliminary injunction (Docket No. 2), defendants'

opposition memorandum, and any reply in further support of the motion, it is

ORDERED that the motion is DENIED.


                                    _____
                                    HON. JEFFREY L. SCHMEHL
                                    United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRANDON M. WILBORN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 18-3597 |
| | : | |
| JEFFERSON B. SESSIONS III, | : | |
| Attorney General of the United States, | : | |
| | : | |
| THOMAS E. BRANDON, | : | |
| Acting Director, Bureau of Alcohol, | : | |
| Tobacco, Firearms and Explosives, | : | |
| | : | |
| CHRISTOPHER WRAY, | : | |
| Director of the Federal Bureau | : | |
| of Investigation, | : | |
| | : | |
| and | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.    Statutory Background .................................................................................... 2

II.   Factual and Procedural Background ............................................................ 4

LEGAL STANDARD .............................................................................................. 6

ARGUMENT .......................................................................................................... 7

I.    Wilborn Is Not Likely to Succeed on the Merits of His Second Amendment
     Claim against the Federal Defendants .......................................................... 7

      A.    The Second Amendment does not guarantee possession of firearms to
           persons with a demonstrated history of mental illness and Section
           922(g)(4) does not burden conduct protected by the Second Amendment
           .......................................................................................................... 8

      B.    Section 922(g)(4) also satisfies scrutiny under controlling precedent .. 10

           1.    Section 922(g)(4) serves important and compelling government
                interests .......................................................................................... 11

           2.    Section 922(g)(4) substantially relates to protecting public safety . 12

II.   Wilborn Is Not Likely to Succeed on the Merits of His Fifth Amendment Due
     Process Claim ............................................................................................. 18

III.  Wilborn Cannot Demonstrate a Likelihood of Irreparable Harm ....................... 22

IV.  Granting a Preliminary Injunction Would Harm Defendants, Third Parties,
     and the Public Interest ................................................................................ 24

CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Acierno v. New Castle County,*
   40 F.3d 645 (3d Cir. 1994) .................................................................................... 25

*Adams v. Freedom Forge Corp.,*
   204 F.3d 475 (3d Cir. 2000) .................................................................................. 22

*Barrett v. United States,*
   423 U.S. 212 (1976) ...................................................................................... 13, 24

*Bell v. United States,*
   No. 13-5533, 2013 WL 5763219 (E.D. Pa. Oct. 24, 2013) ................................ 18, 19

*Binderup v. Att'y Gen. of the U.S.,*
   836 F.3d 336 (3d Cir. 2016) ............................................................................ 7, 11

*Black v. Snow,*
   272 F. Supp. 2d 21 (D.D.C. 2003) .................................................................. 19, 20

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................................ 22

*Clark v. Jeter,*
   486 U.S. 456 (1988) .......................................................................................... 11

*Conn. Dep't of Pub. Safety v. Doe,*
   538 U.S. 1 (2003) ........................................................................................ 20, 21

*Connection Distrib. Co. v. Reno,*
   154 F.3d 281 (6th Cir. 1998) ............................................................................ 24

*Cornish v. Dudas,*
   540 F. Supp. 2d 61 (D.D.C. 2008) ...................................................................... 24

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................................. *passim*

*Del. Valley Fin. Group, Inc. v. Principal Life Ins. Co.,*
   640 F. Supp. 2d 603 (E.D. Pa. 2009) ................................................................... 6

*Dickerson v. New Banner Inst.,*
   460 U.S. 103 (1983) ................................................................................. *passim*

*Drake v. Filko,*
   724 F.3d 426 (3d Cir. 2013) .......................................................................... 12, 15

*Elrod v. Burns,*
   427 U.S. 347 (1976) .......................................................................................... 23

*Estelle v. Smith,*
   451 U.S. 454 (1981) .......................................................................................... 15

*Ezell v. Chicago,*
   651 F.3d 684 (7th Cir. 2011) ............................................................................ 23

*Fla. Bar v. Went For It, Inc.,*
   515 U.S. 618 (1995) .......................................................................................... 15

*Franklin v. Sessions,*
  291 F. Supp. 3d 705 (W.D. Pa. 2017) .......................................................... 2, 21, 22
*Hohe v. Casey,*
  868 F.2d 69 (3d Cir. 1989) .......................................................................... 23
*Huddleston v. United States,*
  415 U.S. 814 (1974) ............................................................................ 13, 24
*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
  882 F.2d 797 (3d Cir. 1989) ........................................................................ 6
*Jeffries v. Sessions,*
  278 F. Supp. 3d 831 (E.D. Pa. 2017) .............................................................. 21
*Kachalsky v. Cty. of Westchester,*
  701 F.3d 81 (2d Cir. 2012) ........................................................................ 13
*Keyes v. Lynch,*
  195 F. Supp. 3d 702 (M.D. Pa. 2016) ............................................................. 19
*Kos Pharms. Inc. v. Andrx Corp.,*
  369 F.3d 700 (3d Cir. 2004) ........................................................................ 6
*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.,*
  562 F.3d 553 (3d Cir. 2009) ....................................................................... 22
*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ................................................................................. 8
*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................ 25
*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck*
  *Consumer Pharm. Co.,*
  290 F.3d 578 (3d Cir. 2002) ....................................................................... 22
*NutraSweet Co. v. Vit-Mar Enters., Inc.,*
  176 F.3d 151 (3d Cir. 1999) ....................................................................... 23
*Pontarelli v. U.S. Dep't of Treasury,*
  285 F.3d 216 (3d Cir. 2002) ....................................................................... 14
*Schall v. Martin,*
  467 U.S. 253 (1984) ........................................................................ 1, 11, 12
*Sessions v. Binderup,*
  No. 16-847, 2017 WL 2722469 (U.S. Jun. 26, 2017) ............................................. 7
*Simpson v. Sessions,*
  No. 16-1334, 2017 WL 1910141 (E.D. Pa. May 10, 2017) ...................................... 20
*Turner Broad. Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) ................................................................................ 12
*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) ................................................................................ 13
*Tyler v. Hillsdale Cty. Sheriff's Dep't,*
  837 F.3d 678 (6th Cir. 2016) ................................................................ 12, 13
*United States v. Bean,*
  537 U.S. 71 (2002) ................................................................................. 14

*United States v. Chamberlain,*
    159 F.3d 656 (1st Cir. 1998)...................................................... 14
*United States v. Chapman,*
    666 F.3d 220 (4th Cir. 2012) ..................................................... 18
*United States v. Giardina,*
    861 F.2d 1334 (5th Cir. 1988) .................................................... 22
*United States v. Hansel,*
    474 F.2d 1120 (8th Cir. 1973) .................................................... 22
*United States v. Julian,*
    974 F. Supp. 809 (M.D. Pa. 1997) ......................................... 14, 19
*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010)....................................... 7, 8, 9, 10
*United States v. Rehlander,*
    666 F.3d 45 (1st Cir. 2012)....................................................... 22
*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................. 11
*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) .................................. 11, 13, 16
*United States v. Staten,*
    666 F.3d 154 (4th Cir. 2011) ..................................................... 16
*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ................................................... 9
*United States v. Waters,*
    23 F.3d 29 (2d Cir. 1994)......................................................... 15
*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) ..................................................... 9
*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................. 1, 12
*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................. 24
*Weinberger v. Salfi,*
    422 U.S. 749 (1975) ................................................................. 14

## STATUTES

18 U.S.C. § 922...................................................................................... 30
18 U.S.C. § 922(d)(4)................................................................................ 5
18 U.S.C. § 922(g)(4) .................................................................... *passim*
18 U.S.C. § 922(g)(8) .............................................................................. 28
50 P.S. § 7302.......................................................................................... 43
50 P.S. §§ 7101-7503 ................................................................................ 6

**INTRODUCTION**

Federal law prohibits an individual who "has been committed to a mental institution" from possessing a firearm. 18 U.S.C. § 922(g)(4). Plaintiff Brandon Wilborn contends that the government should be enjoined from enforcing this statute against him because this restriction violates his Second Amendment and due process rights. The Court should reject these arguments.

As explained in *District of Columbia v. Heller*, the Second Amendment permits the "longstanding prohibition[] on the possession of firearms by . . . the mentally ill." 554 U.S. 570, 626 (2008). Moreover, § 922(g)(4)'s restrictions readily satisfy the intermediate scrutiny test applied by the Third Circuit. Such scrutiny requires the government to demonstrate that a regulation is substantially related to the furtherance of an important government interest. Here, Congress enacted Section 922(g)(4) to further the important governmental interest in preventing "firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances." 114 Cong. Rec. 21,829 (1968) (statement of Rep. Bingham). The Supreme Court has long recognized the government's "legitimate and compelling" interest "in protecting the community from crime," *Schall v. Martin*, 467 U.S. 253, 264 (1984), and its "unquestionably important and legitimate" interest in suicide prevention. *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997).

Permanently disarming Wilborn, who was involuntarily committed pursuant to Section 302 of Pennsylvania's Mental Health Procedures Act is at the very least

"substantially related" to those interests. Wilborn's position here rests primarily on a recent district court decision from the Western District of Pennsylvania, *Franklin v. Sessions*, 291 F. Supp. 3d 705 (W.D. Pa. 2017). However, the court in *Franklin* explicitly declined to hold – as Wilborn urges this Court to do – that a Section 302 commitment may never qualify as an involuntary commitment under Section 922(g)(4). *Id.* at 720. Accordingly, Wilborn's Second Amendment challenge is unlikely to succeed on the merits and it thus does not entitle him to injunctive relief. Likewise, Wilborn's claim under the Due Process Clause does not provide any basis for a preliminary injunction.

## BACKGROUND

## I.      Statutory Background

Federal law includes "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. As relevant here, the Gun Control Act of 1968 (GCA) provides that any person who "has been committed to a mental institution" may not possess firearms and ammunition. 18 U.S.C. § 922(g)(4). The Congressional record on the GCA demonstrates the important governmental interest that motivated its passage: preventing violence, murder, and suicide. *See* 114 Cong. Rec. 21,774 (1968) (Rep. Rosenthal) ("In 1966, 6,855 Americans were murdered by gun; 10,407 suicides and 2,600 fatal accidents involved firearms."); *id.* at 21,811 (Rep. Schwengel) (stating that "[i]n the last decade, 92,747 Americans took their own lives with a firearm."); *id.* at 21,784 (Rep. Celler) ("It is not only deliberate murder, robbery and assault which this legislation

seeks to reduce, but also acts of passion, and gun suicides which have grown to 11,000 in 1967.").

The legislative record further reflects the substantially related means Congress adopted to achieve that purpose: barring from possessing firearms individuals who have a demonstrated history of mental illness. *See, e.g., Federal Firearms Legislation: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 92 (1968) (statement of New York City Mayor John V. Lindsay) (testifying that despite "enact[ing] legislation designed to keep guns out of the hands of those likely to use them irresponsibly[,] . . . such as [*inter alia,*] the mentally ill," local officials could not prevent such persons from misusing firearms because, "[a]s long as the escaped criminal, or mental patient, or addict can obtain a firearm by crossing a bridge or mailing an order, no State or local government can protect its residents adequately, and that pertains to all types of firearms"); *Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 88th Cong. 3375 (1963) (statement of James Bennett, Director, U.S. Bureau of Prisons) (citing an incident involving a mentally ill individual who had bought a firearm "and used it to kill a high school student"); 114 Cong. Rec. 21,784 (1968) (Rep. Celler) (then-Chairman of the House Judiciary Committee stating that "[n]o one can dispute the need to prevent [*inter alia,*] persons with a history of mental disturbances . . . from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons"); *id.*

at 21,819 (Rep. Halpern) (stressing that "the manic depressive contemplating suicide will find it more difficult to take his own life, or that of a friend or relative").

In sum, Congress sought to address these problems by "regulat[ing] more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them." S. Rep. No. 89-1866, at 1 (1966). "[P]ersons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances," 114 Cong. Rec. at 21,829 (Rep. Bingham), were among those whose access to firearms concerned Congress. Congress thus included in the GCA statutory provisions—now codified at 18 U.S.C. § 922(d)(4) and (g)(4)—restrictions directed at "persons with a history of mental disturbances," 114 Cong. Rec. at 21,784 (Rep Celler).

## II.      Factual and Procedural Background

On or about April 7, 2003, plaintiff Brandon Wilborn was involuntarily committed to a mental institution pursuant to Section 302 of Pennsylvania's Mental Health Procedures Act (MHPA), 50 Pa.C.S.A. §§ 7101-7503; Compl. ¶ 17.[1]  Section 302 provides for involuntary emergency examinations and treatment authorized by a physician, not to exceed 120 hours, where there exist "reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment." *Id*. at § 7302. The complaint provides no background or detail, regarding the events leading up to Wilborn's involuntary commitment. Wilborn was involuntarily

---

[1] For the purposes of this memorandum, the factual background is derived from Wilborn's complaint and brief in support of his motion for preliminary injunction.

committed and treated for approximately 72 hours. Pl. Br. in Supp. of Mot. for Prelim. Inj. (Docket No. 2), 2.

In May 2018, Wilborn attempted to purchase a firearm. Compl. ¶ 20. Wilborn's attempt to purchase a firearm was denied by the National Instant Criminal Background Check System (NICS), the federal database that identifies individuals who are prohibited from acquiring firearms. *Id.* Wilborn's appeal of the denial by NICS was unsuccessful. *Id.* at ¶ 21. On May 8, 2018, Wilborn received a letter from the NICS section of the FBI, which stated, in part, that his purchase of a firearm was prohibited "under Title 18, United States Code, Section 922(g)(4): 'A person who has been adjudicated as a mental defective or who has been committed to a mental institution.'" Compl., Exhibit A.

Wilborn filed this lawsuit on August 23, 2018. The complaint alleges two counts. First, Wilborn alleges that the defendants' application of Section 925A of the GCA deprived him of his Second Amendment right to own firearms. *Id.* at ¶¶ 36-42. Second, Wilborn alleges that defendants "violated [his] Fifth Amendment right to due process by denying him the ability to purchase and possess a firearm, as a result of his involuntary evaluation and treatment, when Section 302 of the MPHA fails to provide the individual with an opportunity to be heard by a court, either before or subsequent to his/her deprivation, and no federally acceptable standard of proof was utilized." *Id.* at ¶ 46.

In addition to the filing of his complaint, Wilborn also filed a motion for a preliminary injunction (Docket No. 2). [2] In his motion, Wilborn seeks to enjoin the defendants from enforcing 18 U.S.C. 922(g)(4) against all individuals who, like Wilborn, have been involuntarily committed under Section 302 of Pennsylvania's Mental Health Procedures Act.

## LEGAL STANDARD

A preliminary injunction is an "'extraordinary remedy'" that "'should be granted only in limited circumstances.'" *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989). To demonstrate entitlement to this extraordinary remedy, a plaintiff must show: "(1) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms. Inc.*, 369 F.3d at 708. Unless Wilborn meets his burden of establishing each of these elements in his favor, "the grant of a preliminary injunction is inappropriate." *Del. Valley Fin. Group, Inc. v. Principal Life Ins. Co.*, 640 F. Supp. 2d 603, 616 (E.D. Pa. 2009).

---

[2] Defendants have not yet responded to Wilborn's complaint. Oral argument on the motion for preliminary injunction is scheduled for December 6, 2018.

## ARGUMENT

## I.     Wilborn Is Not Likely to Succeed on the Merits of His Second Amendment Claim against the Federal Defendants

The Second Amendment permits regulation of the possession of firearms by persons with a demonstrated history of mental illness. In *Heller*, after determining that the Second Amendment conferred an individual right to keep and bear arms, 554 U.S. at 595, the Supreme Court squarely held that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626.

Applying *Heller*, the Third Circuit established a two-pronged approach for courts in this Circuit to apply when analyzing Second Amendment challenges:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted). The Third Circuit recently confirmed that in this Circuit "the two-step Marzzarella framework controls all Second Amendment challenges." *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 356 (3d Cir. 2016) (en banc) *cert. denied sub nom. Sessions v. Binderup*, No. 16-847, 2017 WL 2722469 (U.S. Jun. 26, 2017), and *cert. denied sub nom. Binderup v. Sessions*, No. 16-983, 2017 WL 2722471 (U.S. Jun. 26, 2017). Applying that standard, Wilborn is unlikely to succeed on the merits of his  Second Amendment claim because: (1) Section 922(g)(4) affects conduct that falls outside the scope of the Second Amendment's protection; and (2) in any event, Section

922(g)(4) as applied to Wilborn passes muster under the appropriate level of constitutional scrutiny.

A.   The Second Amendment does not guarantee possession of firearms to persons with a demonstrated history of mental illness and Section 922(g)(4) does not burden conduct protected by the Second Amendment

In *Heller*, the Supreme Court explicitly held that the Second Amendment permits "longstanding prohibitions on the possession of firearms by felons and the mentally ill," and explained that "nothing in [its] opinion should be taken to cast doubt on" such measures. *Id.* at 626. The Court "repeat[ed] those assurances" in *McDonald v. City of Chicago.* 561 U.S. 742, 786 (2010) (plurality opinion). In this vein, the Third Circuit has interpreted *Heller* as "delineat[ing] some of the boundaries of the Second Amendment right to bear arms," and has concluded on that basis that "the Second Amendment affords no protection for . . . possession by felons and the mentally ill." *Marzzarella*, 614 F.3d at 92 (footnote and citation omitted); *see also id*. at 91–92 (noting that *Heller*'s "endorsement of prohibitions as opposed to regulations, whose validity would turn on the presence or absence of certain circumstances, suggests felons and the mentally ill are disqualified from exercising their Second Amendment rights"). Thus, under *Heller* and *Marzzarella*, Section 922(g)(4) permissibly prohibits firearm possession by individuals, like Wilborn, who have "been committed to a mental institution." 18 U.S.C. § 922(g)(4).

The historical record confirms this result. The Court in *Heller* recognized as "the predecessor to our Second Amendment," 554 U.S. at 593, the right to arms in the 1689 English Declaration of Rights, which was understood to be consistent with

8

the disarmament of "any person or persons" judged "dangerous to the Peace of the Kingdome" under the 1662 Militia Act, 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.).[3] *See* Joyce Lee Malcolm, *To Keep and Bear Arms* 123 (1st ed. 1994). In the American colonies, disarmament of individuals perceived to be dangerous also was frequent, and such actions were not viewed as inconsistent with the right to bear arms. *See id.* at 140–41; *see also United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

Another "Second Amendment precursor[]" identified by *Heller* as "highly influential," 554 U.S. at 603–04, was a proposal offered by the Pennsylvania antifederalist faction at the Pennsylvania Convention, providing that "the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents*, 1787, *reprinted in* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971). Samuel Adams' proposal at the ratifying convention in Massachusetts—also identified by *Heller* as a "highly influential" "Second Amendment precursor[]," 554 U.S. at 603–04—recommended "that the said Constitution be never construed to authorize Congress to . . . prevent the people of the United States, who are

---

[3] Upon the Court's request, the defendants will submit copies of any of the cited historical reference materials, as well as copies of the empirical studies cited herein.

peaceable citizens, from keeping their own arms." Schwartz, *The Bill of Rights*, at 674–75, 681. The colonial public did not view persons with a history of mental disturbance as being among those who could bears arms without "real danger of public injury." *Id*. at 665.

Wilborn falls within a category of individuals whose possession of firearms may be regulated without offending the Second Amendment. Because persons previously involuntarily committed for reasons of prior mental illness are "disqualified from exercising their Second Amendment rights," "the Second Amendment affords no protection" for firearms possession by such persons. *Marzzarella*, 614 F.3d at 91–92 (footnote and citation omitted). Accordingly, Wilborn's claim fails the first prong of the *Marzzarella* inquiry because Section 922(g)(4) does not "impose[] a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id*. at 89. Accordingly, Wilborn is unlikely to succeed on the merits of his Second Amendment claim.

B.   Section 922(g)(4) also satisfies scrutiny under controlling precedent

Even if the Court were to reject the analysis above, Wilborn's claim would still be unlikely to success on the merits under the second step of the two-pronged approach established by *Marzzarella*. If a challenged law "burden[s] . . . conduct falling within the scope of the Second Amendment's guarantee," the Court must "evaluate the law under some form of means-end scrutiny" and "[i]f the law passes muster under that standard, it is constitutional." *Marzzarella*, 614 F.3d at 89. Intermediate scrutiny applies to Second Amendment challenges to firearms

restrictions. *See Binderup*, 836 F.3d at 353, 356 (Ambro, J.); *see also id*. at 397 (Fuentes, J., dissenting). To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). When analyzed under that standard, Section 922(g)(4)'s restriction on firearms possession substantially relates to the important—indeed, compelling—government interest in protecting the public (including the committed individual) from firearms violence.

1.     *Section 922(g)(4) serves important and compelling government interests*

A primary governmental objective underlying Section 922(g)(4) is to protect the public from "armed mayhem" in the form of firearms violence, and thereby to preserve peace and public safety. *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc). Protecting public safety and combating crime are well-established compelling governmental interests. *See United States v. Salerno*, 481 U.S. 739, 748 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest"); *Schall*, 467 U.S. at 264 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (citation and internal quotations omitted)).

In order to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances," 114 Cong. Rec. 21,829 (statement of Rep. Bingham), Congress addressed the GCA to "individuals who by their previous conduct or

11

mental condition or irresponsibility have shown themselves incapable of handling a dangerous weapon in the midst of an open society," *id*. at 21,809-10 (statement of Rep. Tenzer), including "persons with a history of mental disturbances," *id*. at 21,784 (statement of Rep. Celler). The government's interest "in protecting the community from crime" is "legitimate and compelling," *Schall*, 467 U.S. at 264, as is its interest in preventing suicide. *See Glucksberg*, 521 U.S. at 735 (recognizing the government's interest in suicide prevention as "unquestionably important and legitimate"); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 693 (6th Cir. 2016) (en banc).

> ### 2.    *Section 922(g)(4) substantially relates to protecting public safety*

A substantial relationship exists between protecting public safety (e.g., by preventing violent crime and suicide), on the one hand, and prohibiting firearms possession by persons, such as Wilborn, who have been involuntarily committed based on findings of severe mental disability. Congress's decision to adopt a prophylactic prohibition against the "presumptively risky" category of individuals who have been involuntarily committed, *Dickerson v. New Banner Inst.*, 460 U.S. 103, 112 n.6 (1983), was a justifiable response to the problem of firearms violence that it sought to address. "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the legislature's predictive judgments.'" *Drake v. Filko*, 724 F.3d 426, 436-37 (3d Cir. 2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). Moreover, even if the historical understanding were not dispositive of this case, that historical record would counsel in favor of affording

12

Congress the room, in the context of mental illness, "to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)). *See supra* Sec. I.A; *Skoien*, 614 F.3d at 641 (noting that "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons" and that "some categorical disqualifications are permissible").

Congress sought to limit firearm availability "to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The "animating interest of § 922(g) 'was to keep firearms out of the hands of presumptively risky people.'" *Tyler*, 837 F.3d at 693 (quoting *Dickerson*, 460 U.S. 103, 112 n.6); *see also Barrett v. United States*, 423 U.S. 212, 220 (1976) (citing legislative history reflecting a concern with "keeping firearms out of the hands of categories of potentially irresponsible persons"). Consistent with this intent to keep firearms out of the hands of presumptively risky persons, Section 922(g) is not limited to persons who have already committed dangerous or violent acts. In the case of Section 922(g)(4), Congress relied on a history of involuntary commitment or adjudicated mental illness as the basis for the prophylactic firearm prohibition in the hope of preventing violent acts. *See* 114 Cong. Rec. 14,773 (1968) (Sen. Long) (stating that mentally ill individuals, "by their actions, have demonstrated that they are dangerous, or that they *may become dangerous*"

13

(emphasis added)). In enacting Section 922(g)(4), Congress certainly was aware that "a person committed to a mental institution later may be deemed cured and released"; nevertheless, "[t]he past . . . commitment disqualifies. Congress obviously felt that such a person [who had previously been committed to a mental institution], though unfortunate, was too much of a risk to be allowed firearms privileges." *United States v. Julian*, 974 F. Supp. 809, 814-15 (M.D. Pa. 1997) (citation omitted).

Congress acted logically in relying on impartial criteria as a proxy for future risk of violence as an alternative to crafting a regime mandating individualized predictions of future violence.[4] Such individualized predictions, in addition to being inherently speculative, would impose extraordinarily difficult, if not impossible, burdens on government officials. To avoid such a regime, Congress was entitled to adopt a statutory scheme that instead relied on objective, historical data. *See Weinberger v. Salfi*, 422 U.S. 749, 751 (1975) ("Congress . . . could rationally have concluded . . . that the expense and other difficulties of individual determinations justified the inherent imprecision of an objective, easily administered, prophylactic rule."); *see also United States v. Chamberlain*, 159 F.3d 656, 664 (1st Cir. 1998) ("To require a full-scale adversary proceeding and a finding, by clear and convincing

---

[4] Indeed, this is not an inquiry courts are well suited to conduct. As the Third Circuit has explained in the Section 922(g)(1) context, "courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli v. U.S. Dep't of Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc); *see also United States v. Bean*, 537 U.S. 71, 77 (2002) (noting that courts are not "institutionally equipped" to conduct "neutral, wide-ranging investigation" into whether a person dispossessed under Section 922(g) is likely to act in a manner dangerous to public safety).

evidence, that a person is mentally ill and poses a likelihood of harm to himself or others before giving effect to the firearms ban would undermine Congress's judgment that risk or potential, not likelihood, probability, or certainty, of violence is all that is required."). As the Supreme Court has recognized, there is an inherent difficulty in making such free floating and particularized assessments of dangerousness. *Estelle v. Smith*, 451 U.S. 454, 472 (1981).

Congress determined that persons who have previously been involuntarily committed pose an unacceptable risk of misusing firearms because they are susceptible to future episodes of mental illness. Indeed, the GCA "is designed to prohibit the ownership of firearms not only by individuals who have already committed dangerous acts, *but also by those with a potential for violence*." *United States v. Waters*, 23 F.3d 29, 34 (2d Cir. 1994) (emphasis added). To achieve that purpose, Congress relied on the serious step and objective fact of past commitment due to mental illness. This clearly satisfies intermediate scrutiny, which does not require that the degree of fit between the challenged law and the governmental interest it serves be perfect. *Drake*, 724 F.3d at 436.

Empirical evidence further demonstrates that persons who have been involuntarily committed pose an enhanced risk of violence.[5] Research suggests that

---

[5] The defendants have no additional obligation to produce concrete evidence in support of Congress's legislative judgment, and the Court need not consider such evidence to analyze Section 922(g)(4) as applied to Wilborn. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (noting that even under strict scrutiny, some restrictions on speech can be upheld "based solely on history, consensus, and 'simple common sense.'"). However, such evidence is provided here to the extent it is helpful

persons who suffer from significant mental illness pose an increased risk of harm to themselves or others. *See, e.g.*, Seena Fazel & Martin Grann, *The Population Impact of Severe Mental Illness on Violent Crime*, 163 Am. J. Psychiatry 1397, 1401 (2006) (reporting increased risk "in patients with severe mental illness compared with the general population"). A National Institute of Mental Health (NIMH) study showed that patients with serious mental illness "were two to three times as likely as people without such an illness to be assaultive. In absolute terms, the lifetime prevalence of violence among people with serious mental illness was 16% . . . compared with 7% among people without mental illness." Richard A. Friedman, *Violence and Mental Illness- How Strong Is the Link?*, 355 New Eng. J. Med. 2064, 2065 (2006).

Persons with mental illness also have a significantly increased risk of suicide. The NIMH reports that over 90 percent of persons who commit suicide have a mental disorder, a substance-abuse disorder, or both. NIMH, *Suicide in the U.S.: Statistics and Prevention*. The suicide rate for persons with active psychiatric disorders is 7 to 10 times the rate for the general population. *See* Bryan L. Tanney, *Psychiatric Diagnoses and Suicidal Acts*, in Ronald W. Maris et al., *Comprehensive Textbook of Suicidology* 340 (2000). Consistently, a high suicide rate exists among persons who have previously been committed. *See* Virginia A. Hiday, *Civil Commitment: A Review of Empirical Research*, 6 Behav. Sci. & L. 15, 25 (1988)

---

for the Court's analysis. *See, e.g., United States v. Staten*, 666 F.3d 154, 163–67 (4th Cir. 2011) (relying on empirical data in conducting Second Amendment means-end analysis); *Skoien*, 614 F.3d at 643–44 (same).

(among 189 patients who entered the commitment process, ten had committed suicide within 19 months). And, not surprisingly, firearms are much more likely to cause injury or death than other available weapons, such as knives. As one commentator has noted, "[a] suicide attempt with a firearm rarely affords a second chance," while "[a]ttempts involving drugs or cutting, which account for more than 90% of all suicidal acts, prove fatal far less often." Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New Eng. J. Med. 989, 990 (2008).

For all these reasons, Wilborn's commitment to a mental institution based on a conclusion that he was severely mentally disabled defeats any claim that Section 922(g)(4) is not substantially related to preventing future violent crime or suicide. This outcome reflects Congress's and the nation's long-established judgment that such a person is "too much of a risk to be allowed firearms privileges." *Dickerson*, 460 U.S. at 116. Even were this Court to conclude that Wilborn can now possess firearms without risk of danger, it would not affect the requisite fit between Section 922(g)(4) and Congress's objectives. As the Fourth Circuit recognized when rejecting an as-applied Second Amendment challenge to the analogous 18 U.S.C. § 922(g)(8) restriction (prohibiting possession of firearms by an individual who is the subject of a judicial restraining order): "[T]he prohibitory net cast by [the statute] may be somewhat over-inclusive given that not every person who falls within it would misuse a firearm . . . if permitted to possess one," but "[t]his point does not undermine the [statute's] constitutionality . . . because it merely suggests

17

that the fit is not a perfect one[.]" *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012) (citations omitted).

In sum, the Section 922(g)(4) restriction substantially relates to the government's objectives of preventing firearms violence, including suicide, and protecting public safety. As such, Wilborn is extremely unlikely to succeed on the merits of his Second Amendment claim.

## II.     Wilborn Is Not Likely to Succeed on the Merits of His Fifth Amendment Due Process Claim

Because Wilborn will be unable to show that his Second Amendment rights have been violated, he is not likely to succeed on the merits of a due process claim premised on the deprivation of these substantive rights. Moreover, Wilborn's claim that he was deprived of his Second Amendment rights without due process protections when he was committed pursuant to Section 302 of the MHPA is unlikely to succeed on the merits. *See Bell v. United States*, No. 13-5533, 2013 WL 5763219, at *3 (E.D. Pa. Oct. 24, 2013), *aff'd*, 574 F. App'x 59 (3d Cir. 2014).

In *Bell*, the Third Circuit rejected a procedural due process challenge to 18 U.S.C. § 922(g)(1) – which prohibits firearms possession by felons – and "conclude[d], for the reasons stated by the District Court, that [the plaintiff]'s procedural due process claim . . . [is] without merit." *Bell*, 574 F. App'x at 61. The plaintiff there claimed that Section 922(g)(1) violated due process because the statute had allegedly "deprive[d] [plaintiff] of the ability to possess a firearm without providing him a hearing to determine his future dangerousness." *Bell*, 2013 WL 5763219, at *3 (citation omitted). As the court explained, "[t]he plain language

18

of [that statute] makes clear Congress's decision to bar all convicted felons (not merely those with violent tendencies or who otherwise present an ongoing danger to society) from possessing firearms." *Id.* (quoting *Black v. Snow*, 272 F. Supp. 2d 21, 34 (D.D.C. 2003), *aff'd*, 110 F. App'x 130 (D.C. Cir. 2004)). Consequently, the court held that the plaintiff's procedural due process claim failed: "[D]ue process does not entitle [a felon] to a hearing to determine whether he is currently dangerous because the results of such a hearing would have no bearing on whether he is subject to the disability imposed by § 922(g)(1)." *Id.* (second alteration in original) (quoting *Black*, 272 F. Supp. 2d at 35).

Because the same is true with respect to Section 922(g)(4), the same result follows. *See Keyes v. Lynch*, 195 F. Supp. 3d 702, 723 (M.D. Pa. 2016) (applying the logic of *Bell* to reject the plaintiff's "contention that he deserved some kind of hearing before or after being subjected to the disability under § 922(g)(4)"). In enacting Section 922(g)(4), Congress was aware that "a person committed to a mental institution later may be deemed cured and released[;]" nevertheless, "[t]he past . . . commitment disqualifies. Congress obviously felt that such a person [who had previously been adjudicated as a mental defective or committed to a mental institution], though unfortunate, was too much of a risk to be allowed firearms privileges." *Julian*, 974 F. Supp. at 814–15 (quoting *Dickerson*, 460 U.S. at 116–17).

Due process principles do not require that Wilborn be afforded "an opportunity to be heard by a court, either before or subsequent to his/her deprivation." Compl. ¶ 46. The only matter relevant to Section 922(g)(4) is whether

19

Wilborn was previously committed to a mental institution. See *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4 (2003) ("[D]ue process does not require an opportunity to prove a fact that is not material to the State's statutory scheme."); *Black*, 272 F. Supp. 2d at 35 (applying *Doe* and concluding that "due process does not entitle plaintiff to a hearing to determine whether he is currently dangerous because the result of such a hearing would have no bearing on whether he is subject to the disability imposed by § 922(g)(1)").

In both his complaint and motion for preliminary injunction, Wilborn urges the Court to find that an involuntarily commitment pursuant to Section 302 of Pennsylvania's Mental Health Procedures Act can *never* qualify as an involuntary commitment under 18 U.S.C. § 922(g)(4). For the reasons explained above, such a holding would be at odds with the language and legislative intent of the Gun Control Act. Moreover, it would be inconsistent with the decisional law in this Circuit, which has uniformly held that a Section 302 commitment may qualify as an involuntary commitment under Section 922(g)(4). *See, e.g.*, *Simpson v. Sessions*, No. 16-1334, 2017 WL 1910141, at *1 (E.D. Pa. May 10, 2017) (Schmehl, J.).

In *Simpson*, the plaintiff (Simpson) had an argument with his wife and was involuntary committed – pursuant to Section 302 – after threatening suicide. *Id.* at **1, 5. Simpson later successfully sought relief of his Pennsylvania firearm disability and unsuccessfully sought to expunge the record of his involuntary commitment. *Id.* The Court rejected Simpson's Second Amendment challenge to Section 922(g)(4), finding that – despite Simpson's claims of rehabilitation and

experience with firearms – his past behavior resulting in involuntary commitment "directly refutes Plaintiff's claimed 'lack of dangerousness.'" *Id.* at \*6. *See also, Jeffries v. Sessions*, 278 F. Supp. 3d 831, 847 (E.D. Pa. 2017) (dismissing plaintiff's Second Amendment challenge because Jeffries "fail[ed] to distinguish his involuntary commitment for being a danger to himself from the class of individuals Congress prohibited" and failed to state a claim for a Fifth Amendment violation because he "is not constitutionally entitled to process before the United States subjects him to the prohibition under § 922(g)(4)").

Wilborn relies extensively on a recent district court decision from the Western District of Pennsylvania, *Franklin v. Sessions*, 291 F. Supp. 3d 705 (W.D. Pa. 2017). *See, e.g.*, Compl. ¶¶ 3, 19, 24, 26, 35, 40, 41; Pl. Br. in Supp. of Mot. for Prelim. Inj., 1-3, 6, 16-18. Wilborn mischaracterizes that case, stating that the court there held a "302 examination and treatment does not trigger a prohibition under 18 U.S.C. § 922(g)(4)." Compl. ¶ 40. Wilborn suggests that the court in *Franklin* adopted the categorical rule for which he advocates in this case. However, the court in *Franklin* made no such sweeping holding.[6] Rather, after a period of discovery and extensive fact-finding, the court held that "Section 302 of the MHPA *as applied to Mr. Franklin* [did] not constitute an adjudication that Mr. Frankin is 'a mental defective' or a 'commit[ment] to a mental institution – therein not implicating

---

[6] Counsel for the plaintiff in *Franklin* – who also represents Wilborn here – raised the same argument in that case, that "Section 302 is legally insufficient to putatively strip an individual" of the right to purchase firearms under federal law. Pl. Mot. for S.J. at 16, Docket No. 37, *Franklin v. Boente*, Civ. No. 16-36 (W.D. Pa. March 2, 2017). As noted above, the court declined to adopt that position.

Section 922(g)(4)'s firearms restrictions. . . ." *Franklin*, 291 F. Supp. 3d at 719-20. The court in *Franklin* explicitly declined to reach the broader issue of whether a Section 302 commitment may never qualify as an involuntary commitment under Section 922(g)(4). *Id.* at 720.[7]

Here, Wilborn concedes that he has previously been involuntarily committed. Compl. ¶¶ 23-25. Consistent with all the decisional law in this circuit, that involuntary commitment forms a proper basis for a firearms prohibition under Section 922(g)(4). Consequently, Wilborn's Fifth Amendment Due Process claim is likely to fail.

## III.   Wilborn Cannot Demonstrate a Likelihood of Irreparable Harm

A party seeking a preliminary injunction must establish that it is likely to suffer irreparable injury in the absence of the requested relief. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 595 (3d Cir. 2002)). The threat of irreparable injury must be "real," "substantial," and "immediate," not speculative or conjectural. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983). Accordingly, courts may not grant preliminary injunctions "'unless the moving party shows that it specifically and personally risks irreparable

---

[7] Wilborn also relies on a number of cases arising out of criminal convictions for illegal possession of firearms. These cases include *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012), *United States v. Giardina*, 861 F.2d 1334 (5th Cir. 1988), and *United States v. Hansel*, 474 F.2d 1120 (8th Cir. 1973). *See* Pl. Br. in Supp. of Mot. for Prelim. Inj., 19-21. These decisions are not binding precedent for this Court, and in any event, none of these criminal cases involves the Pennsylvania statute at issue here.

harm.'" *Liberty Lincoln-Mercury, Inc.*, 562 F.3d at 557 (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000)). Although Wilborn asks the Court to presume that he will suffer irreparable harm because his constitutional rights have been infringed, "injury to constitutional rights does not *a priori* entitle a party to a finding of irreparable harm." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."). Nor is the Court required to presume a violation of Wilborn's constitutional rights, as this inquiry involves a question of law.

Irreparable harm may be presumed if plaintiffs are likely to succeed on the merits, because a deprivation of constitutional rights generally constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ezell v. Chicago*, 651 F.3d 684, 699-700 (7th Cir. 2011). But here, Wilborn's claim of irreparable harm is entirely dependent on the assumption that his Second Amendment challenge has merit. Because Wilborn is unlikely to succeed on the merits, there is no justification for a preliminary injunction. Wilborn has not established by a clear showing that he will suffer irreparable harm in the absence of injunctive relief, so his motion should be denied. *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (the "failure to establish any element . . . renders a preliminary injunction inappropriate").

IV.    **Granting a Preliminary Injunction Would Harm Defendants, Third Parties, and the Public Interest**

Because Wilborn has not made the threshold showings of irreparable harm and a likelihood of success on the merits, there is no need for the Court to proceed to the balancing phase of the preliminary injunction analysis. However, even if the Court were to consider the balance of equities and public interest, it should still deny Wilborn's motion because these factors tip sharply in favor of the defendants. As explained above, Wilborn falls within a category of individuals whose possession of firearms may be regulated without offending the Second Amendment. Thus, no deprivation of Wilborn's Second Amendment rights has occurred and he has not been harmed. On the other hand, the public interest in protecting the public (including the committed individual) from firearms violence is substantial. As a general matter, "there is inherent harm to an agency" in preventing it from enforcing statutes and regulations that "Congress found it in the public interest to direct that [it] develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 296 (6th Cir. 1998) ("[T]he granting of an injunction against the enforcement of a likely constitutional statute would harm the government.").

As the Supreme Court recognized, Congress sought to limit firearm availability "to those whose possession thereof was contrary to the public interest." *Huddleston*, 415 U.S. at 824. The legislative "intent in enacting [] § 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson*, 460 U.S. at 112 n.6; *see Barrett*, 423 U.S. at 220 (citing legislative history reflecting a

24

concern with "keeping firearms out of the hands of categories of potentially irresponsible persons"); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("[Courts] should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). Wilborn's requested preliminary injunction would prevent the government from enforcing the prohibitions on firearm possession by individuals who have been committed to a mental institution pursuant to Pennsylvania's Mental Health Procedures Act, 50 Pa. C.S.A. § 7302, and, would thus inflict a very real harm on the public.[8] *See Nken v. Holder*, 556 U.S. 418, 420 (2009) (consideration of harm to the opposing party and the public interest "merge when the Government is the opposing party"). Therefore, the requested preliminary injunction should be denied.

---

[8] With the motion for preliminary injunction, Wilborn is seeking to alter the status quo by enjoining enforcement. However, a "primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994).

## CONCLUSION

For the foregoing reasons, the Court should deny Wilborn's motion for a preliminary injunction.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

s/ Gregory B. David/srb
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

s/ David A. Degnan
DAVID A. DEGNAN
Assistant United States Attorney
615 Chestnut St., Suite 1250
Philadelphia, Pennsylvania 19106
(215) 861-8522
david.degnan@usdoj.gov

Date: October 31, 2018

**CERTIFICATE OF SERVICE**

I certify that the foregoing memorandum was filed electronically and is available for viewing and downloading via the Court's ECF system.

s/ David A. Degnan
DAVID A. DEGNAN
Assistant United States Attorney

Date: October 31, 2018